**SONY COMPUTER ENTER-
TAINMENT AMERICA
INC., Plaintiff,**

v.

**GAMEMASTERS, Michael Chaddon,
and Carol Chaddon, Defendants.**

**No. C 99–02743 TEH.**

United States District Court,
N.D. California.

Nov. 4, 1999.

Scott D. Baker, William R. Overend, Crosby Heafey Roach & May, San Francisco, CA, for Plaintiff.

Glen L. Moss, Ann Murphy, Moss & Murphy, Hayward, CA, Albert J.C. Chang, law Offices of Albert J.C. Chang, Rowland Heights, CA, David R. Schwarz, Law Offices of David R. Schwarcz, Los Angeles, CA, Manny D. Pokotilow, Caesar Rivise Bernstein & Cohen, Inc., Philadelphia, PA, David Pressman, San Francisco, CA, for Defendants.

### ORDER GRANTING PLAINTIFF'S REQUEST FOR PRELIMINARY INJUNCTION

HENDERSON, District Judge.

1. This civil action is brought by Sony Computer Entertainment America Inc., against Michael and Carol Chaddon, d.b.a. GameMasters, Inc., for trademark and copyright infringement, contributory trademark and contributory copyright infringement, violation of the Digital Millennium Copyright Act, and state and federal unfair competition laws.

2. This matter is now before the Court on plaintiff's motion for a preliminary injunction. Based upon the evidentiary record, the parties' moving papers, and arguments of counsel, IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

### I. Procedural Posture

3. In January 1999, SCEA learned that Defendants were selling allegedly counterfeit accessories for SCEA's PlayStation video game. An SCEA employee, Jerry Jessop, purchased an allegedly counterfeit PlayStation memory card, video game controller, and a device known as the "Game Enhancer" from the GameMaster's store in San Leandro on January 17, 1999. After some analysis, SCEA concluded that the peripheral items were counterfeit. Plaintiff has attached copies of the packaging of both products as exhibits. (Jessop Decl. Ex. B).

4. On June 10, 1999, SCEA filed *ex parte* for a Temporary Restraining Order ("TRO"). On June 11, 1999, this Court granted SCEA's request for a TRO and Order for Seizure and Impoundment of Counterfeit Goods and directed that all motions and papers be filed under seal. We also directed the parties to appear and Show Cause why a Preliminary Injunction should not Issue and ordered an Expedited Discovery schedule.

5. On June 15, 1999, SCEA carried out the Seizure Order impounding numerous allegedly counterfeit accessories (including 41 memory cards, 2 CD–ROM mechanism boxes; a Japanese Dual Shock Controller, and 7 PlayStation cases) totaling approximately $4,000 in value. (M.Chaddon Decl. at 4:13). Upon closer scrutiny, Sony determined that about $3,000 of these products were not counterfeit and returned them (45 Dual Shock Controllers and 6 Digital Controllers). (M.Chaddon Decl. Ex. D, Pltf. M. at 8 n. 6). Defendants claim that the remaining goods were being sold legally and were not counterfeit. These goods consisted of such items as "replacement housing" repair parts and Sony products initially sold in Japan or foreign jurisdictions. Plaintiff SCEA claims that in addition to the allegedly counterfeit games and peripheral accessories SCEA originally targeted, the seizure uncovered counterfeit PlayStation memory cards and alternate versions of the "Game Enhancer" device.

6. On July 26, 1999, the parties stipulated to an extension of the TRO which the Court signed the same day.

7. On November 1, 1999, the Court heard arguments from the parties on Why a Preliminary Injunction Should Not Issue.

The Court adopts the following Findings of Fact and Conclusions of Law:

## Findings of Fact

### The Parties

1. Plaintiff, Sony Computer Entertainment America Inc. is a corporation organized and existing under the laws of Delaware, with its principal place of business in Foster City, California.

2. Defendants, Michael Chaddon and Carol Chaddon are the co-owners of Game-Masters, Inc. Michael Chaddon works as the Manager, while Carol Chaddon works as a retail sales person. GameMasters, Inc., is a small retail shop in San Leandro, California which sells used games and peripheral accessories for use with the Sony PlayStation, in addition to new games and accessories purchased from third party vendors other than Sony. The Chaddon's have operated this business since 1992.[1]

3. Defendants have impleaded several of their wholesalers and suppliers as third party defendants to this lawsuit: TOMMO, Inc.; S & I MARKETING Inc.; BRIAN BROWN IMPORTS; MAT ELECTRONICS, Inc.; and INNOVATION TECHNOLOGY, Inc. Of the Third Party defendants named in this lawsuit, only TOMMO, Inc. filed an answer within the 20 days allotted by Rule 12 of the Federal Rules of Civil Procedure. All other Third Party defendants are technically in default.

### The Suit

4. This suit is for 1) trademark infringement, 2) trademark counterfeiting, 3) contributory trademark infringement, 4) contributory copyright infringement in violation of federal law (15 U.S.C. § 1114, "Lanham Act"), 5) violation of the Digital Millennium Copyright Act, 17 U.S.C. § 1201, 6) unfair competition in violation of state law, CAL. BUS. & PROF.CODE § 17500 and 7) unfair competition in violation of federal law pursuant to the Lanham Act;

5. Defendants assert counterclaims against SCEA for 1) copyright and trade-

---

**1.** Michael Chaddon has been charged in a separate proceeding with criminal copyright infringement in violation of Title 17 U.S.C. section 506(a), and Title 18 U.S.C. section 2319(b)(3). Chaddon was arraigned on October 22, 1999, and plead Not Guilty. *U.S.A. v. Chaddon*, No. CR 99–40212 WDB, Oakland Venue (N.D.Cal.1999).

mark misuse, 2) declaratory relief and 3) antitrust violations.

6. Though not at issue in the pending motion, Defendants assert claims against the Third Party defendants for 1) breach of warranty of title in violation of CAL. COMM.CODE § 2312 et. seq., 2) equitable indemnity, 3) declaratory relief, and 4) implied indemnity.

### Plaintiff SCEA's Trademarks and Copyrights

7. SCEA is a worldwide manufacturer of home entertainment products, including the PlayStation game console. The PlayStation is an electronic game system designed to allow users to play CD–Rom video games at home on a television. The device is popular; since 1994, approximately 50 million of these consoles have been sold worldwide. (Hopkins Decl. ¶ 4.) SCEA is the exclusive United States licensee of the federally registered trademarks that correspond to its PlayStation game console.

8. SCEA owns federally registered trademarks to the "PLAYSTATION" trademark (U.S. Registration Nos. 1,903,-261), "PlayStation" stylized trademark (U.S. Registration Nos. 2,053,625), and "PS" stylized letter and design trademark (U.S. Registration Nos. 1,975,267), along with trademarks for titles and logos of video games compatible with the PlayStation console (U.S. Registration Nos. 2,181,-062 ("Jet Moto"); U.S. Registration Nos. 2,012,799 ("Twisted Metal"); and 2,088,405 ("Football Gamebreaker")). (Hopkins Decl. Ex. A,B,D).

9. The PlayStation stylized "PS" trademark is a four-color, three-dimensional graphic design in which a vertically-oriented "P" is connected to a horizontally-oriented "S" appearing in a black box. (Hopkins Decl. ¶ 6). The trade dress in which PlayStation products have been continuously packaged and marketed since 1995 by SCEA includes use of the trademarks and other features as follows:

I. Cover Panel

1. A picture of the peripheral device appears in a slightly diagonal position across the front of the cover.

2. The picture is presented on a black background with a nimbus of light behind and above the upper left portion of the device.

3. (a) The PS insignia appears on the upper right corner of the cover in a black box framed by a white border and a "TM" just outside the lower right corner of the box. (b) The "P" is red and vertically angled as if it represents the front side of a three dimensional cube. The "S" is yellow, green and blue, and is horizontally angled below the "P" in the position of the bottom face of a three dimensional cube. (c) The bottom of the "P" meets with the bottom of the "S." (d) Below the PS insignia, "PlayStation" appears in small white print.

4. The trademark "PlayStation" appears in the trademarked design font in large white letters across the bottom of the cover with a smaller "TM" at the end of the text. The "P" and "S" in PlayStation are capitalized and the other letters are lowercase.

5. "Sony" appears in large white letters below the lower left half of the peripheral device picture.

II. Side Panels

1. The side panels have a smaller picture of the device on a grey and white background and the "PS" insignia is reproduced in a black box similar to that on the cover.

2. "PlayStation" appears in the design font in large grey letters across the bottom of the panel much as it is presented on the cover.

III. Top Panel

The top panel is a black background with the "PS" logo reproduced in a black box in the upper right corner similar to that on the cover, and "PlayStation" appears in the design font in large white letters in the lower

left corner much as it is presented on the cover. (*See* Hopkins Decl. Ex. C).

10. All of said registrations are valid, subsisting, remain in full force and effect, and under 15 U.S.C. § 1057(B), are "prima facie evidence of the validity of the registration, of registrants' ownership of the mark and of registrants' exclusive right to use the mark in commerce...." 15 U.S.C. § 1057(B).

11. SCEA distributes the PlayStation game console, authorized video games and other related products only to retailers, sales representatives and distributors, who then sell the authorized products bearing the protected marks to the public. SCEA's trademarks have been extensively used, advertised and promoted throughout the United States and worldwide. As a result, the marks have achieved broad national recognition as identifying SCEA as the exclusive source of its products and distinguishing such products from those of others.

12. SCEA has built up extensive goodwill in its PlayStation marks through the world-wide sale of PlayStation products, games and accessories. This goodwill represents a valuable asset to plaintiff.

### Defendant's Use of the Marks

#### A. Video Game Controller

13. Among the items SCEA seized from defendants' store on June 15, 1999, were 52 game controllers (1 Japanese Dual Shock Controller; 45 Dual Shock controllers; 6 Digital controllers). Game controllers are hand held peripheral devices used to play and direct the video game. Plaintiff has submitted color copies of the packaging for these controllers. (Jessop Decl. Ex. B).

14. The trade dress of the authorized SCEA game controller is the same as the detailed description provided above. Al-

though the seized game controllers' trade dress is not identical to that of the authentic controllers, the seized items' packaging bears substantially similar, if not identical, replicas of SCEA's stylized "PS" PlayStation trademark and "PLAYSTATION" trademark. Moreover, the device is labeled the "SonyPad PS." (Jessop Decl. ¶ 16–18, Ex. B).

#### B. Memory Cards

15. On June 15, 1999, SCEA seized and analyzed 41 memory cards designed for use with the Sony PlayStation. A memory card is a small plastic cartridge which plugs into a port on the front of the PlayStation game console to allow users to save their game progress for later play. Plaintiff has included color copies of the packaging for the memory cards. (Jessop Decl. ¶¶ 9–14, Ex. B). While the packagings of the seized memory cards varies, each package in question bears a substantially similar, if not identical, replica of Sony's stylized "PS" PlayStation trademark.[2]

#### C. Game Console Moldings

16. SCEA seized seven game console moldings. Plaintiff submitted color photocopies of some of these moldings at the November 1, 1999 hearing. According to the declaration of SCEA's Hardware Engineering Manager for the PlayStation game console, Jerry Jessop, the moldings are identical to "SCEA's '5500 series' PlayStation console mold[s]" except made in various colors. (Jessop Decl. ¶ 8). Jessop declares that these console cases contain unauthorized reproductions of SCEA's stylized "PS" trademark. The seized moldings appear to be the same as the SCEA manufactured PlayStation casing except in various colors, however, there are no observable references to the PlayS-

---

**2.** For example, one package bears the PlayStation trademark vertically ascending the left edge of the front of the package. Just above this writing is a substantially similar, if not identical, replica of Sony's stylized "PS" PlayStation trademark. The memory card itself is housed under clear plastic molding in the center of the cardboard swatch. The back of the package bears a substantially similar, if not identical, replica of Sony's stylized "PS" PlayStation trademark in the upper left hand corner.

tation or SCEA trademarks on the items in question.

### D. CD Mechanism Boxes

17. SCEA seized two "CD Mechanism Boxes." It is unclear from the parties' briefings exactly what the nature or function of these items are as no explanation has been provided and no exhibits. According to the declaration of Jerry Jessop, the boxes bear SCEA trademarks even though SCEA "does not sell these products separately." (Jessop Decl. ¶ 15).

### E. Game Enhancer Device

18. SCEA seized a device known variously as the "Game Enhancer", the "GameKillers", "Game Blaster Pro", the "Wizard" or "Code Wizard." (hereafter "Game Enhancer") (Def. Opp. at 5). Plaintiff has included copies of the Game Enhancer packaging and user instructions, from one of the devices, as exhibits. (Jessop Decl. Ex C & D). All wording on the Game Enhancer packaging is in Japanese except the words "Action Replay" borne upon the four side panels of the box. The packaging bears no replicas of any SCEA trademarks. However, the front of the box bears two white stickers which state in English that the device "Plays Japanese Imports ... works like a Gameshark." (Jessop Decl. Ex C). Another white sticker states "External Mod–Chip for all PlayStation models." (Jessop Decl. Ex C). The lower right hand corner of the back of the Game Enhancer box states in English, "[t]his is not an official Sony Product." (Jessop Decl. Ex C).

19. The Game Enhancer is an external device manufactured by numerous companies which, when plugged into the PlayStation game console, performs *at least two* functions.[3]

First, the Game Enhancer permits users to modify the rules of a specific game. The device makes temporary modifications to the video game's computer program al-

lowing a user to "cheat" *i.e.,* to make the game harder or easier by giving themselves a handicap or an advantage. For example, a player might input a certain code to give his game character infinite "lives" or unlimited ammunition. (Chaddon Decl. at 6). The Game Enhancer makes no permanent modifications to the underlying video game data and the modifications exist only while a specific game is being played. *Id.*

20. The second function of the Game Enhancer is to permit players to play games sold in Japan or Europe and intended by SCEA for use exclusively on Japanese or European PlayStation consoles. (Chaddon Decl. ¶ 10, Jessop Decl. ¶¶ 17–24). The PlayStation console is designed to operate only when encrypted data is read from a CD–ROM that verifies that the CD is an authorized, legitimate SCEA product licensed for distribution in the same geographical territory of the console's sale. (Pltf. Mo. at 20). Games not licensed for distribution in the same territory as that of the console's sale cannot be played on the PlayStation without a device such as the Game Enhancer. (*Id.;* Jessop Decl. ¶ 16).

21. The Game Enhancer comes with instructions explaining how a user may configure the PlayStation console to play "imports." After inserting an authorized CD game, the user is instructed to find a means of holding the disc cover switch in the closed position while keeping the lid or disc cover open. Under normal operation, the disc cover switch only stays down when the disc cover is closed. The switch can be improperly kept down while the disc is open in a variety of ways. The Game Enhancer is then turned on and its internal operating system is selected for execution, thereby replacing the PlayStation console's internal operating system. The validity and territorial codes are then read and the CD is considered valid and

---

3. The Game Enhancer is manufactured by third party defendant Innovation Technology, distributed through S & I Marketing, TOM-MO, Inc., Brian Brown and other companies. (Third Party Compl ¶ 13).

acceptable for operation. The instructions direct a user to hit the "select" button on the game controller which signals the console to stop the CD motor. Once the motor is stopped, the consumer is instructed to remove the "U.S." game CD and replace it with "the CD game you want to play." Once the game has been loaded, the Game Enhancer returns control to the PlayStation's operating system. However, since the console has already verified the previous U.S. CD and does not know that the CD has been replaced, the import or other CD may be played as if it was a U.S. CD. (Jessop Decl. TRO ¶¶ 19–24). Both parties submitted copies of Game Enhancer or Game Enhancer like user instructions which contains a section entitled "Play Imports." (Jessop Decl. Ex. D; Chaddon Decl. Ex. C).[4]

22. The Game Enhancer is similar to numerous other video game modification devices which allow the player to "cheat" such as the "Pro Action Replay" manufactured by Datel Ltd. of Great Britain, or the "Game Shark" manufactured by SCEA. However, the Game Enhancer, unlike the original Pro Action Replay or Game Shark device, enables users to play imported, i.e., non-territory games as described above. (Jessop Decl. ¶ 19).

23. SCEA contends that the Game Enhancer performs a third function: allowing users to play "backups," i.e., counterfeit copies of original PlayStation software. (Jessop Decl. ¶ 19). Defendants contend that the Game Enhancer does not enable the console to play counterfeit games. (Chaddon Decl. ¶ 14). The user instructions for the Game Enhancer refer to "Play Imports" but do not in anyway refer to "backups" or "bootlegs" or "copies."[5] SCEA has submitted advertising from a

website for the Game Doctor which suggests that the Game Enhancer 5.0 does in fact enable users to play counterfeit games, but no evidence suggests that GameMasters sold or possessed the Game Enhancer 5.0. (Overend Suppl. Decl. C).

24. SCEA contends that the Game Enhancer device poses a safety hazard to the consumer by instructing consumers to defeat the CD safety interlock switch, i.e., the disc cover switch, potentially exposing the consumer to "the laser beam emitted from the lens of" the PlayStation unit which "may be harmful to the eyes." (Jessop Decl. ¶ 24, quoting PlayStation Instruction Manual). The PlayStation Instruction Manual admonishes users: As the laser beam ... may be harmful to the eyes, do not attempt to disassemble the casing.... *Id.*

## Conclusions of Law

1. This Court has jurisdiction over this action pursuant to 15 U.S.C. section 1121, as it arises under the Lanham Act, pursuant to 28 U.S.C. section 1331 as it presents a federal question, pursuant to 28 U.S.C. section 1338(a), as this suit concerns an act of Congress relating to patents, copyrights and trademarks. We have supplemental jurisdiction over plaintiff and defendants' state law claims under 28 U.S.C. section 1367 and the doctrines of ancillary and pendent jurisdiction.

2. Venue is proper in this Federal District court pursuant to 28 U.S.C. Section 1391(b) and 1400(a) because defendants reside within this judicial district and a substantial part of the events giving rise to the alleged claims occurred in this district.

3. Congress has expressly vested the Federal Courts with "... power to grant

---

4. The Court draws its discussion entirely from the GameEnhancer instructions submitted by both parties as exhibits and the accompanying declarations. At the Nov. 1, 1999, hearing, plaintiff's counsel demonstrated how a consumer would attach *a* Game Enhancer type device to the PlayStation Console. However, plaintiff made no showing that the Game Enhancer type device he demonstrated at trial was the same type as that sold by the

Defendants. Defense counsel rightly objected and the Court disregards the presentation.

5. At the Nov. 1, 1999, hearing, plaintiff's counsel suggested that "imports" was a term of art encompassing counterfeit or bootleg games as well as actual imports. The Court finds no basis or evidence supporting plaintiff's definition of the term "imports."

injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office." 15 U.S.C. § 1116; 17 U.S.C. § 1203 (injunctive relief for violations of Digital Millennium Copyright Act).

4. A federal registration of a service mark constitutes *prima facie* evidence of the exclusive right to use the registered mark in the United States. 15 U.S.C. § 1115(A).

## Standard for Preliminary Injunctive Relief

5. The preliminary injunction is an equitable remedy. As such, it is an extraordinary remedy, and the burden is on the moving party to make a clear showing that the remedies at law are inadequate. CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2948.

6. Generally, a court may issue a preliminary injunction if it determines:

(1) the moving party will suffer irreparable injury if the relief is denied;

(2) the moving party will probably prevail on the merits;

(3) the balance of potential harm favors the moving party; and, depending on the nature of the case,

(4) the public interest favors granting relief. *Johnson v. California State Board of Accountancy*, 72 F.3d 1427, 1430 (9th Cir.1995).

7. The Ninth Circuit has adopted an alternative standard under which the moving party may meet its burden by demonstrating either:

(1) a combination of probable success on the merits *and* the possibility of irreparable injury if relief is not granted;

Or

(2) the existence of serious questions going to the merits *and* that the balance of hardships tips sharply in its favor. *Id.* (emphasis added)

**6.** The same principles apply to trade dress infringement. *Two Pesos, Inc. v. Taco Cabana*

8. Under this last part of the alternative test, even if the balance of hardships tips decidedly in favor of the moving party, it must be shown, as an irreducible minimum, that there is a fair chance of success on the merits. *Stanley v. University of Southern California*, 13 F.3d 1313, 1319 (9th Cir.1994). The alternative standards are not separate tests but rather the opposite ends of a single continuum in which the required showing of harm varies inversely with the required showing of meritoriousness. *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988).

■ 9. In the trademark context, the standard for issuing a preliminary injunction tracks the traditional standard with a few exceptions. First, likelihood of success on the merits is demonstrated by proving that a person's infringing use of the mark "is likely to cause confusion, or to cause mistake, or to deceive ... as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person...." 15 U.S.C. § 1125(a)(1)(A); *New West Corp. v. NYM Co. of Cal., Inc.*, 595 F.2d 1194, 1201 (9th Cir.1979) ("the ultimate test is whether the public is likely to be deceived or confused by the similarity of the marks").[6]

Second, in the Ninth Circuit, eight factors are traditionally considered in determining the likelihood of confusion:

1. strength of the mark;

2. proximity of the goods;

3. similarity of the marks;

4. evidence of actual confusion;

5. marketing channels used;

6. types of goods and degree of care likely to be exercised by the purchaser;

7. defendant's intent in selecting the mark; and

8. likelihood of expansion of the product lines.

*Inc.*, 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).

*AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348–49 (9th Cir.1979); *see also Vision Sports, Inc. v. Melville Corp.,* 888 F.2d 609, 616 (9th Cir.1989) (same factors used in trade dress analysis). However, the Ninth Circuit has emphasized that at the preliminary injunction stage, "the trial court is not required to consider all of those factors" since the record will not likely be sufficient to permit thorough consideration. *Apple Computer, Inc. v. Formula Intern. Inc.,* 725 F.2d 521, 526 (9th Cir.1984) (affirming issuance of preliminary injunction on grounds that trade names were "confusingly similar" despite district court's failure to consider the eight *AMF* factors).

Third, once plaintiff establishes a likelihood of confusion, "it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief does not issue." *Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215, 1220 (9th Cir.1987) (citing *Apple Computer,* 725 F.2d at 526), *cited and followed in, Vision Sports,* 888 F.2d at 612 n. 3.

10. Loss of business is not the test of irreparable injury in motions for preliminary injunctions against the use of a trademark. The fact that plaintiff has had the symbol of its reputation placed in the hands of another is irreparable injury. *Visa International Service Association v. Bankcard Holders of America,* 1981 WL 40539, 211 U.S.P.Q. 28, 39 (N.D.Cal. 1981)(the mere fact that the plaintiff has had the symbol of its reputation placed in the hands of another constitutes irreparable injury).

11. The district court has broad discretion in deciding whether or not to issue a preliminary injunction, *K–2 Ski Co. v. Head Ski Co.,* 467 F.2d 1087 (9th Cir., 1972), and will not be overturned on appeal unless the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact. *Triad Systems Corp. v. Southeastern Express Co.,* 64 F.3d 1330, 1334 (9th Cir.1995).

**Probable Success on the Merits**

12. Trademark infringement occurs when a person uses a mark in commerce, without the registrant's consent, in a manner that is likely to cause confusion, mistake or deception. 15 U.S.C. § 1114. To prevail at trial, SCEA must prove that there is such a likelihood of confusion in defendant's use of the trademark.

13. SCEA may establish a *prima facie* case of trademark infringement by showing 1) rightful ownership of the marks in suit and 2) likelihood of confusion or mistake amongst the public from the defendants' use of the marks. *Jockey Club, Inc. v. Jockey Club of Las Vegas,* 595 F.2d 1167 (9th Cir.1979).

14. Plaintiffs have provided the Court with trademark registration certificates for the titles and designs for the PlayStation trademarks discussed above; this creates a presumption of exclusive ownership. 15 U.S.C. § 1115(A).

15. A simple comparison between the seized game controller and memory card packaging and the authentic game controller and memory card packaging confirms not merely a strong likelihood of confusion, but the inevitably of it. The packaging of these two types of items seized by Plaintiff from Defendants' store bears trademarks that are identical to, or substantially indistinguishable from, SCEA's registered trademarks.

16. Jerry Jessop, SCEA's Hardware Engineering Manager, attests that based upon his experience, a visual inspection of the memory cards and their packaging led him to conclude that they were counterfeit. (Overend Decl. Ex 4, ¶¶ 9–14). *Inter alia,* the pictures and writings on defendants' products are "poor quality, fuzzy and unclear," the registered trademark symbol is too large to be consistent with proper usage, and the "S" in the stylized "PS" trademark on the memory cards themselves is of irregular thickness. *Id.*

17. Jessop similarly concluded that the game controllers were counterfeit based upon his expertise and a visual inspection. (*Id.* at ¶¶ 16–18).

18. Defendant claims that neither the memory cards nor the game controllers are counterfeit but provides no evidence to support this claim.

19. The counterfeit memory card bears marks *identical* to the PlayStation stylized trademark. In fact, some of the cards are contained within identical packaging colors as authentic SCEA memory cards. Confusion over the origin and authenticity of the products is inescapable—the packaging is identical.

20. Although the allegedly counterfeit controller pad packagings are not identical to that of SCEA authorized controllers, there is a strong likelihood of confusion between these products as well. The seized game controller packagings bear trademarks that are identical to, or substantially indistinguishable from, SCEA's registered trademarks.

21. We are convinced that for the game pad controllers and the memory card, a high likelihood of confusion exists between Defendants' products and Plaintiff's and therefore, Plaintiff is likely to succeed upon its claims of trademark and copyright infringement. Consumers are likely to assume that defendants' product originated from plaintiff.

22. SCEA has also charged defendants with trademark counterfeiting. Trademark counterfeiting occurs by producing or selling a product that bears a "counterfeit" trademark. 3 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 25.10, AT 25–14 (4TH ED. 1997); 15 U.S.C. § 1116(D)(B)(I). Section 1114 of the Lanham Act, which establishes the trademark counterfeiting cause of action, prohibits the use of "any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale ... of any goods ... [where] such use is likely to cause confusion ... or to deceive." 15 U.S.C. § 1114(1)(a).

23. As with the Trademark Infringement claim, a simple comparison of SCEA's trademarks with those on the game controllers, memory cards and CD Mechanism Boxes shows that the marks they use are either identical or substantially indistinguishable from SCEA's legitimate authorized marks. Thus, plaintiff has a good chance of succeeding on it's trademark counterfeiting claim.

24. Plaintiff has not demonstrated a strong likelihood of success on its claims relating to the game console moldings. While the seized moldings look similar in form to the PlayStation console, the seized moldings bear no trademarks at all. There is a cast relief of an image whose outline is similar to the PlayStation stylized trademark, but there is no mark.

25. Defendants claim that it is nearly impossible for them to know if a wholesaler has mistakenly provided an illegal game in a shipment because the manufacturers often use minor variations of its trademarks in packaging identical games. (Chaddon Decl. ¶ 21). However, "willful blindness" is no defense to a charge of knowing and intentional counterfeiting. It is enough that a retailer "failed to inquire further because he was afraid of what the inquiry would yield." *Louis Vuitton S.A. v. Lee,* 875 F.2d 584, 590 (7th Cir.1989).

26. SCEA charges defendants with contributing to unnamed others' trademark infringement and copyright infringement of SCEA's intellectual property rights in the PlayStation marks and PlayStation video games through its sales of the Game Enhancer device discussed above.

27. Contributory infringement occurs when the defendant either intentionally induces a third party to infringe the plaintiff's mark or supplies a product to a third party with actual or constructive knowledge that the product is being used to infringe the service mark. *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 853–54, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). The classic statement

of the doctrine is in *Gershwin Publishing Corp. v. Columbia Artists Management,* 443 F.2d 1159, 1162 (2nd Cir.1971) ("[O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer."); *see also Universal City Studios v. Sony Corp. of America,* 659 F.2d 963, 975 (9th Cir.1981), *rev'd* on other grounds, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) (adopting *Gershwin* in this circuit).

28. SCEA alleges only the latter basis for contributory infringement liability and therefore must prove that GameMasters supplied a product to third parties with actual or constructive knowledge that its product was being used to infringe SCEA's other marks *Id.* at 854, 102 S.Ct. 2182.

29. This proof necessarily begs the question of whether or not the Game Enhancer is in fact being used to infringe upon SCEA's trademark or copyright rights. SCEA has submitted no evidence showing any likelihood that third parties are infringing SCEA's marks through use of the Game Enhancers sold by Defendants.

30. Moreover, the gravamen of a contributory infringement action is the defendant's knowledge. If the Chaddons continued to supply a product knowing that the consumer or third party was using the product to engage in trademark infringement, they would clearly be liable. *Inwood,* 456 U.S. at 854–5, 102 S.Ct. 2182. However, the scant evidence and allegations by SCEA only state that Chaddon supplied a product that consumers *could have used* to engage in trademark infringement.

31. Secondly, it is not clear exactly how, if at all, the Game Enhancer itself enables trademark infringement since the games in question are Sony manufactured, Sony authorized, authentic PlayStation Games. It would seem that the games, legally, validly manufactured and sold in Japan, for example, do not become transformed into illegal, bootleg infringing games merely because they are transported across the ocean and sold by third parties who may choose to do so. A consumers choice to play the non-territorial game cannot be the infringing activity. *Los Angeles News Service v. Reuters Television International,* 149 F.3d 987, 994 (9th Cir.1998).

32. SCEA's arguments that sales of the Game Enhancer constitute contributory trademark and copyright infringement appear to be based more so upon its claims that "the device was specifically designed to facilitate and enable the sale of the bootleg games that infringe SCEA's trademarks." SCEA claims that sales of this device undermine SCEA's profits from authorized PlayStation video games and threatens its ability to control the quality of products bearing its registered marks.[7]

33. However, it is not clear that the Game Enhancer facilitates the use of games that are truly counterfeit. SCEA has provided no evidence suggesting that the Game Enhancer enables the PlayStation to play "back up" or "counterfeit" games. This Court has declarations from Plaintiff saying the Game Enhancer does allow play of "counterfeit" games and declarations from Defendants saying that it does not. There is no reference to "back up" or "bootleg" games anywhere in the Game Enhancer instructions. The games which the GameEnhancer enables consumers to play upon the PlayStation are not necessarily illegal games, rather they may be legitimate and authorized Sony products, but authorized only for sale in foreign territories such as Japan.

**7.** SCEA also claims that use of the Game Enhancer poses a safety hazard to the public by circumventing PlayStation safety devices designed to protect users from exposure to "potentially harmful laser energy." Each PlayStation instruction manual sold with each game console warns: "As the laser beam emitted from the lens of this unit may be harmful to the eyes, do not attempt to disassemble the casing. Refer for technical assistance. Call [Sony ph. number]."

34. In addition to the questions raised above, the record is grossly lacking in evidence of defendants' actual knowledge of either type of infringement by third parties, or of facts sufficient to prove defendant's constructive knowledge. Defendants argue that they have no knowledge of how consumers may use the Game Enhancer beyond the "cheat" / play import functions nor could they control such additional use.

35. We cannot say as a matter of law that SCEA is likely to prevail upon the merits of its contributory copyright or contributory trademark infringement claims based upon defendant's sale of the Game Enhancer because 1) there is insufficient evidence of defendants' actual or constructive knowledge, and 2) there is insufficient evidence before this Court that the Game Enhancer enables the play of counterfeit, and not merely imported but authentic, SCEA video games.

36. From the above discussion however, it is clear that plaintiff has shown "the existence of serious questions on the merits" of its contributory claims. However, we need not address whether "the balance of the hardships tips" in SCEA's favor because we find that SCEA is likely to succeed upon its claim that defendants' sale of the Game Enhancer violates the Digital Millennium Copyright Act. 17 U.S.C. § 1201.

37. The Digital Millennium Copyright Act, among other things, prohibits distribution of any product or device which:

1) is primarily designed or produced for the purpose of circumventing a technological measure (or a protection afforded by a technological measure) that effectively controls access to a system protected by a registered copyright or effectively protects a right of a copyright owner in a registered work or portion thereof;

2) has only limited commercially significant purpose or use other than to circumvent such a technological measure (or protection afforded it);

Or

3) is marketed for use in circumventing such a technological measure (or protection afforded by it). 17 U.S.C. § 1201(a)(2)-(3) and (b)(1)-(2) (Public Law 105–304, October 28, 1998).

38. Section 1201 also prohibits manufacture or distribution of technologies, products and services used to circumvent technological measures which control access. The prohibition applies only if such circumventing technologies are primarily designed for this purpose, have only limited commercial purpose beyond such circumventing purpose, or are marketed for the prohibited purpose. This provision is immediately effective. *See generally* Katherine C. Spelman, Current Developments in Copyright Law 1999, 567 Practicing Law Institute / Patents, Copyrights, Trademarks, and Literary Property Course Handbook Series 31, 49.

39. Defendant concedes in its opposition papers that "[t]he Game Enhancer makes temporary modifications to the [PlayStation] computer program ... [c]hanging these codes with the Game Enhancer does not alter the underlying software made by SONY." (Def. Opp. at 6). Based upon the declarations before this Court, the Game Enhancer's distinguishing feature appears to be its ability to allow consumers to play import or non-territorial SCEA video games. As discussed above, SCEA specifically designed the PlayStation console to access only those games with data codes that match the geographical location of the game console itself. The Game Enhancer circumvents the mechanism on the PlayStation console that ensures the console operates only when encrypted data is read from an authorized CD–ROM. (Pltf's Reply at 7). Thus, at this stage, the Game Enhancer appears to be a device whose primary function is to circumvent "a technological measure (or a protection afforded by a technological measure) that effectively controls access to a system protected by a registered copyright...." 17 U.S.C. § 1201(a)(2)(A).

40. Plaintiff has demonstrated that it is likely to prevail upon the merits of its claim that defendant's sale of the Game Enhancer violates the Digital Millennium Copyright Act. Title 17 of the United States Code section 1203 authorizes this Court to issue a preliminary injunction to prevent violations of the Digital Millennium Copyright Act. 17 U.S.C. § 1203.

### Irreparable Injury

1. The law infers irreparable harm from a *prima facie* showing of likelihood of success on the merits of a trademark infringement claims. *International Jensen v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir.1993). SCEA has pled that the sales of these unauthorized products in deceptively similar if not identical trade dress constitutes an irreparable injury in, *inter alia*, the form of lost goodwill. Defendant claims that since each of the products in question is available from numerous other retail sources both in this geographical region and via the Internet, GameMasters continued sale of the products will result in no actual harm to SCEA.

2. This argument does not comport with Ninth Circuit standards for determining irreparable injury in this context. It is well settled in this Circuit that where the movant has demonstrated a likelihood of success upon the merits of its intellectual property claims, irreparable injury is to be presumed. *Metro Publishing Ltd. v. San Jose Mercury News*, 987 F.2d 637, 640 (9th Cir.1993); *Apple*, 725 F.2d at 525; *Triad Systems Corp. v. Southeastern Express Co.*, 64 F.3d 1330, 1335 (9th Cir. 1995). Moreover, GameMaster's argument suggests that plaintiff's must protect its intellectual property rights in an "all or nothing" fashion, suing every infringing retailer at once or suing none at all.

3. Absent injunctive relief, consumers may mistakenly purchase Defendants' products thinking SCEA is their true and original source. These purchases would cause SCEA not only to lose substantial sales of legitimate authorized products, but also to jeopardize the good will it has accrued in the quality of its products.

4. Defendants are also incorrect in claiming that SCEA must prove that GameMasters will violate SCEA's intellectual property rights in the future. Injunctive relief is appropriate even where defendants have ceased their illegal conduct. *Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132 (9th Cir.1986) (reversing district court's refusal of injunctive relief where defendant voluntarily ceased infringing activity shortly after suit was brought); *Sierra On–Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415 (9th Cir.1984)(although defendant had stopped using disputed term, injunction was appropriate).

### Contract Claim Defense

1. Defendants offer a rather ephemeral and misguided argument that SCEA's claims and the ensuing dispute are more properly viewed as "a commercial dispute under Article 2 of the California Commercial Code." (Def. Opp. at 13). Defendant apparently claims that since it is merely a retailer selling merchandise secured from third parties, its cross claims against these third parties should supplant plaintiff's claims under federal trademark law. The argument is non-sensical and unsupported by the case defendant provides, *Sun Microsystems v. Microsoft Corp.*, 188 F.3d 1115, 1999 WL 635783 (9th Cir.1999). As plaintiff points out, *Sun* involved two companies which had contracted with one another for licensing rights. SCEA and GameMasters have no licensing agreements and no other Commercial or contractual relationship. (Pltf. Reply at 4). Defendant will have ample opportunity to press its contract or warranty claims upon those parties with whom it actually has such relationships.

### Copyright Misuse Defense

1. Defendants argue that plaintiff should be denied injunctive relief because it is misusing its copyright and trademark rights, specifically by trying to extend or enlarge the privileges bestowed by these rights. GameMasters

argues that plaintiff is actually seeking to enjoin sales of the Game Enhancer because it competes with a similar product manufactured by SCEA, the Game Shark. The GameShark and the GameEnhancer are not the same product as only the Game Enhancer allows users to play non-authorized, non-territory video games by circumventing the PlayStation's built in controls. SCEA's targeting of the GameEnhancer is based upon a sound construction of the Digital Millennium Copyright Act as demonstrated by the above analysis. The injunction shall issue.

### Modification of Relief Ordered Issues

■■■■ 1. A portion of plaintiff's proposed preliminary injunction prevents defendant from using color photo-copies of SCEA video-game covers to display the second hand games for sale from defendant's inventory. (See ¶ 4 of proposed Prel. Inj). Defendants essentially argue that their display of photocopied game covers is a "fair use" because it prevents shoplifting.

2. The Copyright Act of 1976 confers upon copyright holders the exclusive right to prepare and authorize others to prepare derivative works based on their copyrighted works. *See* § 17 U.S.C. 106(2). A derivative work must incorporate a protected work in some concrete or permanent "form." The Copyright Act's defines a derivative work as follows:

> A "derivative work" is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, *art reproduction,* abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted.

17 U.S.C. § 101 (emphasis added), *see Mirage Editions,* 856 F.2d at 1342

3. Defendant's use of plaintiff's copyrighted images for commercial use is clearly prohibited by federal copyright laws. The photocopies are derivative works used to promote sales of defendant's product which supplant purchaser's demand for plaintiff's product. While a commercial use does not by itself preclude a defense of fair use, "every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright." *Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 451, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). Plaintiff is well within it's rights in prohibiting such use. Moreover, we believe that a small bit of well channeled creative energy can discern a method of informing the customer of defendants' inventory without inviting theft.

4. Enjoining sale of imported games. Paragraph 5 of SCEA's proposed preliminary injunction would prohibit GameMasters from selling SCEA games made for the Japanese or Asian markets. This issue was discussed above in considering SCEA's likelihood of prevailing upon its contributory infringement claims. It is unclear whether under current Tariff and Customs laws, GameMasters is entitled to sell such games or whether SCEA is entitled to define them as "unauthorized" and enjoin their sale. Plaintiff cites no cases on the matter and defendant's citations are inapposite. The injunction here issued does not prevent the sale or rental of such valid SCEA non-territorial products in their original packaging.

### Preliminary Injunction Order

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the Defendants, their agents, servants, employees, representatives, successors and assigns, and all other persons, firms, or corporations acting in concert, privity or participation with them be, and hereby are, enjoined from:

1. Advertising, promoting, distributing, selling, transporting or purchasing the Game Enhancer, or any device that permits a consumer to play or use on the PlayStation unauthorized ("unauthorized" is defined, for the purpose of this Order only, to mean non-SCEA products, as well

as SCEA products which are manufactured, sold or distributed without license or other authority from SCEA, its parents, affiliates, or subdivisions) copies, colorable imitations, or otherwise infringing versions of SCEA's copyrighted products;

2. Advertising, promoting, distributing, selling, transporting or purchasing the Game Enhancer, or any other device that permits a consumer to play or use foreign made SCEA games that could not otherwise be played on the PlayStation without the Game Enhancer device;

3. Advertising, promoting, distributing, selling, transporting or purchasing the Game Enhancer device, or any other device that directly or contributorily violates SCEA's rights under the Digital Millennium Copyright Act, 17 U.S.C. § 1201, which provides that no person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, which (a) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under Title 17 of the United States Code, b) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under Title 17 of the United States Code, c) is marketed by that person or another in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under Title 17 of the United States Code, d) is primarily designed or produced for the purpose of circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under Title 17 of the United States Code in a work or a portion thereof, e) has only limited commercially significant purpose or use other than to circumvent protection afforded by a technological measure that effectively protects a right of a copyright owner under Title 17 of the United States Code in a work or a portion thereof, or f) is marketed by that person or another in concert with that person with that person's knowledge for use in circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under Title 17 of the United States Code in a work or portion thereof;

4. Using SCEA's trademarks, logos or trade dress, or any reproduction, counterfeit, copy or colorable imitation of said marks, logos or trade dress, in connection with the purchase, sale, transportation, manufacture or distribution of unauthorized peripheral products and accessories that are intended to be used in connection with the PlayStation game console, or in any manner likely to cause others to believe that Defendants' products are connected with, or authorized by, SCEA or are SCEA's branded products, when they are not;

5. Passing off, distributing, selling or enabling others to pass off, sell or distribute any unauthorized copies or versions of SCEA's peripheral products or accessories;

6. Misrepresenting that unauthorized products advertised, promoted or sold by Defendants are SCEA products or are affiliated with SCEA, when they are not:

7. Engaging in any other activity constituting an infringement or contributory infringement of SCEA's intellectual property;

8. Using SCEA's trademarks, logos or trade dress, or any reproduction, counterfeit, copy or colorable imitation of said marks, logos or trade dress, in connection with the purchase, sale, transportation, manufacture or distribution of unauthorized peripheral products and accessories, not the products of SCEA, intended to be used in connection with the PlayStation game console, or in any manner likely to cause others to believe that Defendant's products are connected with SCEA or are SCEA's branded products;

9. Committing any other acts calculated to cause purchasers to believe that un-

authorized products are SCEA products, including, but not limited to, the display, promotion, advertisement, manufacture, distribution, transfer or sale of any product which is not authorized by SCEA, but which displays an SCEA trademark;

10. Distributing, selling or promoting any unauthorized peripheral products or accessories intended to be used in connection wit the PlayStation game console, wherein the product is represented, either expressly or by implication, as being a SCEA product or as being authorized by SCEA;

11. Representing to any wholesaler, retailer, customer, potential customer or the public that a peripheral product or accessory supplied by Defendants that was intended to be used in connection with the PlayStation game console originates from SCEA or that said product has been licensed, sponsored or approved by SCEA or is in some way connected or affiliated with SCEA, if such product represented is not authorized by SCEA;

12. Purchasing, leasing, borrowing or otherwise obtaining any unauthorized peripheral products or accessories intended to be used in connection with the PlayStation game console, or any other unauthorized SCEA products, where such products bear any SCEA trademark, label or packaging, or any colorable imitations thereof;

13. Moving, discarding, destroying, selling, transferring or otherwise disposing of:

a. Any peripheral products and accessories bearing or utilizing any SCEA Trademarks, or any colorable imitations thereof;

b. Any containers, labels, wrappers, stickers, signs or other material containing any SCEA Trademarks or markings, or any colorable imitations thereof;

c. Any sales, promotional or advertising materials bearing any SCEA Trademarks, or any colorable imitations thereof;

d. Any documents and records, including any electronically or computer stored records or data, relating in any way to the manufacture, distribution, sale or promotion of any peripheral products and accessories that have been or are intended to be sold as an authentic SCEA product;

e. Any documents and records, including any electronically or computer stored records or data, relating in any way to the purchase, acquisition, manufacture, distribution, sale, promotion or disposition of peripheral products and accessories that bear any of SCEA's Trademarks;

f. Any goods, labels, signs, prints, packages, wrappers, brochures, promotional materials, printing devices, and documents relating in any way to the promotion, manufacture, distribution, purchase, acquisition or sale of the Game Enhancer, or any other device that directly or contributorily violates SCEA's rights under the Digital Millennium Copyright Act, 17 U.S.C. § 1201.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED:

That the Preliminary Injunction shall remain in effect throughout the pendency of this suit and until further Court Order.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED:

That SCEA has posted a bond in the amount of $25,000.00 as security determined adequate for the payment of such damages as any person may be entitled to recover as a result of the preliminary injunction set forth herein, and that such bond shall remain in effect pending further Court Order.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED:

That the Order for Seizure and Impoundment of Counterfeit Goods entered on June 11, 1999, was properly issued and is hereby confirmed. *See* 15 U.S.C. 1116(d)(10)(A).

IT IS FURTHER ORDERED, ADJUDGED AND DECREED:

That the Seal imposed on this case is hereby dissolved.

IT IS FURTHER ORDERED, AD-JUDGED AND DECREED:

That SCEA shall immediately return to GameMasters the replacement housings seized and discussed above.

**IT IS SO ORDERED.**